UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
LOUNDIA ANN BYRD,

          Plaintiff,

       - against -                   **MEMORANDUM AND ORDER**
                                            15-CV-403 (RRM)

CAROLYN W. COLVIN,
Acting Commissioner of Social Security

          Defendant.
-----------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

Plaintiff Loundia Ann Byrd brings this action against defendant, Carolyn W. Colvin,

Acting Commissioner of the Social Security Administration (the "Commissioner"), pursuant to

42 U.S.C. §§ 405(g), 1383(c)(3), seeking review of the Commissioner's determination that she is

not entitled to Social Security Disability benefits (SSD) under Title II of the Social Security Act

or Supplemental Security Income benefits (SSI) under Title XVI of the Social Security Act.

Byrd and the Commissioner have cross-moved for judgment on the pleadings pursuant to Federal

Rule of Civil Procedure ("Rule") 12(c).  (Pl.'s Mot. J. Pleadings. (Doc. No. 15); Def.'s Mot. J.

Pleadings. (Doc. No. 17).)  For the reasons set forth below, Byrd's motion is DENIED and the

Commissioner's cross-motion is GRANTED.

## BACKGROUND

### I.    Procedural History

On March 1, 2011, Byrd applied for Disability Insurance Benefits (DIB) and on March

16, 2011, she applied for Supplemental Security Income (SSI).  (Admin. R. (Doc. No. 19) at

198–205, 206–12, 227.)  Byrd alleges she became disabled on February 24, 2011 due to

breathing problems, a heart condition, and high blood pressure.  (*Id.*)  On August 12, 2011,

Byrd's claims were denied.  (*Id.* at 155.)  On August 18, 2011, Byrd requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 163–65.)

On January 24, 2013, Byrd received a hearing with the Social Security Administration ("SSA") Office of Disability Adjudication and Review in Brooklyn, New York.  (*Id.* at 175–79.) ALJ Edward H. Hein presided over the hearing where Byrd, a witness for the claimant, and an impartial vocational expert testified.  (*Id.* at 116–52.)  Byrd waived the right to representation at the hearing and moved forward as a *pro se* claimant.  (*Id.* at 120–25.)  On June 14, 2013, the ALJ issued a decision that Byrd was not disabled within the meaning of the Social Security Act.  (*Id.* at 100–14.)  On December 22, 2014, the Appeals Council denied Byrd's request for review.  (*Id.* at 1–5.)  On January 26, 2015, Byrd filed the instant action.  (Compl. (Doc. No. 1).)

Before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c).  (Pl.'s Mot. J. Pleadings.; Def.'s Mot. J. Pleadings.)  Byrd asserts that (1) the ALJ failed to fully develop the record; (2) the ALJ failed to properly evaluate Byrd's credibility; and (3) certain evidence submitted to the Appeals Council is new and material.  (Mem. L. Supp. Pl.'s Mot. J. ("Pl.'s Mem.") (Doc. No. 16) at 11, 16.)  The Commissioner argues that she correctly found that Byrd was not disabled.  (Mem. L. Supp. Def.'s Mot. J. ("Def.'s Mem.") (Doc. No. 18) at 11.)

## II.    Administrative Record

### A.  Medical Evidence Prior to Byrd's Alleged Disability Onset Date

#### a.  Woodhull Medical Center

On July 21, 2008, Byrd was admitted to Woodhull Medical Center ("Woodhull") for chest pain.  (Admin. R. (Doc. No. 19) at 268.)  Byrd was given simvastatin, nitroglycerin,

acetaminophen, and aspirin.  (*Id.*)  Her condition improved with medication and she was discharged on July 22, 2008.  (*Id.*)

On November 24, 2010, Byrd returned to Woodhull due to palpitations.  (*Id.* at 317.)  The hospital noted that Byrd had a history of chest pain and dyspnea on exertion.  (*Id.*)  Byrd underwent a myocardial perfusion study which showed normal left ventricular wall motion.  (*Id.*)  The study yielded no scintigraphic evidence of fixed or reversible ischemic myocardial perfusion defects.  (*Id.*)  On November 29, 2010, Byrd was diagnosed with palpitations.  (*Id.* at 322.)  A twenty-four hour Holter monitoring test showed sinus rhythm (normal heart rate and rhythm).  (*Id.*)

### B.  Medical Evidence On and After Byrd's Alleged Disability Onset Date

#### a.  Woodhull Medical Center – Dr. Sunggeun Lee, Dr. Rajiv Pant, & Dr. Mario Sabado

On February 28, 2011, Byrd went to the emergency room at Woodhull with complaints of chest pain, nausea, vomiting, headache, blurred vision, and dizziness.  (*Id.* at 272.)  Byrd also complained of bradycardia (slow heart rate) and frequent episodes of dizziness in the past year.  (*Id.* at 272, 277.)  She was admitted to the hospital with a diagnosis of symptomatic bradycardia (slower than normal heart rate).  (*Id.* at 272.)  Dr. Sunggeun Lee examined Byrd and noted that November 2010 stress tests and an echocardiogram were normal.  (*Id.* at 275–76.)  Dr. Lee also noted that Byrd smoked and declined medication to stop smoking.  (*Id.* at 273.)  The Woodhull notes indicate that Byrd had been taking nifedipine at home to control her hypertension.  (*Id.* at 308.)  Dr. Lee indicated that Byrd experienced mild intermittent asthma/COPD (chronic obstructive pulmonary disease).  (*Id.* at 307.)  Byrd's physical examination was unremarkable.  (*Id.* at 276–77.)  An electrocardiogram (ECG) revealed sinus bradycardia without conduction

delay or ischemic findings.  (*Id.* at 276–77.)  Attending physician, Dr. Rajiv Pant, found that Byrd possibly needed a pacemaker.  (*Id.* at 277.)

On March 7, 2011, Byrd returned to Woodhull with complaints of chest pain, blurry vision, and dizziness.  (*Id.* at 269.)  Byrd was given atropine and her heart rate increased.  (*Id.*)  A pacemaker was implanted by Dr. Mario Sabado.  *(Id.* at 265, 269–71.)

### b.  Long Island College Hospital

On May 6, 2011, Byrd reported to Long Island College Hospital (LICH).  (*Id.* at 450.)  Byrd filled out a questionnaire, noting that she needed to see a doctor because she had a heart attack and gastritis.  (*Id.* at 450.)  A physical examination revealed shortness of breath and chest pains.  (*Id.* at 448–49.)  Byrd reported that she smoked five cigarettes per day for the previous twenty years.  (*Id.* at 447.)  Byrd was referred for cardiology and pulmonary follow-up.  (*Id.* at 448–49.)

On May 25, 2011, Byrd returned to LICH with complaints of chest pain worsened by physical activity.  (*Id.* at 451.)  She reported smoking five cigarettes per day for the previous twenty years.  (*Id.*)  Byrd was directed to have a stress test.  (*Id.* at 452.)

On April 6, 2011, Byrd was seen at LICH for chest pain occurring daily and lasting fifteen minutes at a time, with multiple episodes since March.  (*Id.* at 446.)  Her pain was worse with food and Byrd had lost ten pounds over the last month.  (*Id.*)  Lab tests were ordered and referrals were made to cardiology and pulmonology.  (*Id.* at 449.)

### c.  Dr. Jerome Caiati – Consultative Examiner

On May 9, 2011, Dr. Jerome Caiati conducted a consultative internal medicine examination of Byrd.  (*Id.* at 325.)  Byrd complained of a history of hypertension since 2011, asthma since 2009, and a history of bradycardia that was treated with a pacemaker.  (*Id.*)  Byrd

reported that in 2011 she was hospitalized and diagnosed with acute myocardial infarction, and had been treated with medication and a pacemaker. (*Id.*) Byrd complained of "on and off" chest pain. (*Id.*)

Byrd reported that she stopped smoking on February 27, 2011. (*Id.*) Byrd lived with her three children, and reported that she was unable to cook, clean, do laundry, go shopping, or take care of her children due to being unwell. (*Id.* at 325–26.) Byrd could shower independently, but needed help dressing. (*Id.* at 326.) She watched television. (*Id.*)

On examination, Dr. Caiati found Byrd's pulse was regular with her blood pressure at 122/80. (*Id.*) Her gait and stance were normal. (*Id.*) Byrd could walk on her heels and toes without difficulty and could squat fully. (*Id.*) Byrd needed no help changing for the examination or getting on and off the examination table, and she was able to rise from a chair without difficulty. (*Id.*) Byrd used no assistive devices. (*Id.*) An examination of the chest, lungs, and heart was normal. (*Id.*) Musculoskeletal and neurological examinations were also normal. (*Id.* at 327.) Dr. Caiati further noted that Byrd's extremities were normal, as well as the fine motor activity of her hands. (*Id.*) A pulmonary function test showed minimal restriction (*Id.* at 329–30.)

Dr. Caiati assessed hypertension, asthma, a history of bradycardia, a history of gastritis, a history of myocardial infarction and post myocardial chest pain with no stress test for evaluation, and an unspecified foot injury. (*Id.* at 327.) Based on his examination, Dr. Caiati found Byrd had no restrictions for sitting, standing, walking, reaching, pushing, pulling, lifting, climbing, or bending. (*Id.* at 328.)

### d. SUNY Downstate Medical Center & LICH – Dr. Ellen Bondar & Dr. Padmakshi Singh

On June 1, 2011, Byrd was admitted to SUNY Downstate Medical Center ("SUNY Downstate") with unstable angina and an elective percutaneous coronary intervention. (*Id.* at 332-33.) Cardiac catheterization revealed mild diffuse disease in the left anterior descending artery and left circumflex artery, 80% stenosis in the proximal right coronary artery, and an ejection fraction (EF) of 60%. (*Id.* at 348–49.) A stent was inserted. (*Id.* at 333–34.) Byrd was discharged the next day. (*Id.* at 333.) Her principal diagnosis was coronary artery disease/status post percutaneous coronary intervention to right coronary artery. (*Id.*)

Notes from SUNY Downstate dated June 3, 2011 indicate that Byrd's hypertension was moderately controlled. (*Id.* at 360.)

On July 27, 2011, SUNY Downstate progress records note that Byrd complained of constipation, dysphagia, and COPD. (*Id.* at 356.) Her blood pressure was 150/100. (*Id.*) The records note that Byrd continued to smoke. (*Id.*) She was referred for a swallow test. (*Id.*)

In a letter dated August 10, 2011, Dr. Ellen Bondar stated that Byrd was a patient at SUNY Downstate-LICH with a history of hypertension, coronary artery disease, and asthma. (*Id.* at 363.) On August 24, 2011, Byrd was again referred for a swallow test. (*Id.* at 392.)

On December 19, 2011, Byrd went to LICH for a follow-up. (*Id.* at 389.) She complained of a cough and chest pain. (*Id.*) A chest x-ray done that same day revealed no evidence of acute pleural/pulmonary pathology. (*Id.* at 436.)

On January 13, 2012, Byrd underwent a myocardial perfusion stress and rest test, revealing no ischemic changes, ejection fraction at 71%, and good left ventricular wall motion. (*Id.* at 437.) The study showed no exercise induced ischemia. (*Id.*) Byrd reported for a follow-up visit on February 7, 2012. (*Id.* at 417). She reported that she had lost twelve pounds. (*Id.*)

The stress test was noted as negative with the theory that Byrd's chest pain, which had previously been considered cardiac in nature, was most likely due to gastritis. (*Id.*)

On March 1, 2012, Byrd's pacemaker was assessed and was found to be functioning properly. (*Id.* at 438–40.) The pacemaker function report indicated that Byrd was experiencing "occasional episodes of PAF [paroxysmal atrial fibrillation]" and the accompanying chart labels Byrd's atrial pacing as abnormal, citing "borderline abnormal changes possibly due to myocardial ischemia."[1] (440–41.)

On August 14, 2012, Byrd underwent an upper endoscopy (EGD), which revealed non-erosive gastritis and a small heterogeneous mucosal island that was found in the distal esophagus. (*Id.* at 404, 470.) The hypopharynx, gastroesophageal junction, pylorus, and duodenum all appeared normal, (*Id.*)

On August 22, 2012, follow-up notes from SUNY Downstate indicated that Byrd was asymptomatic from a cardiac standpoint and that she was undergoing a work up for dysphagia and weight loss. (*Id.* at 407.)

In a letter dated November 21, 2012, Dr. Padmakshi Singh of SUNY Downstate stated that Byrd continued to have multiple medical issues, including hypertension and congestive heart failure/coronary artery disease. (*Id.* at 454.) Byrd had undergone a cardiac stent placement and placement of a pacemaker. (*Id.*) Byrd also had severe acid reflux and weight loss of unknown origin. (*Id.*) Dr. Singh stated that medical evaluations were ongoing and recommended that Byrd refrain from working until a clear diagnosis was determined and tests were reviewed. (*Id.*)

---

[1] Myocardial ischemia occurs when blood flow to the heart is reduced, preventing it from receiving enough oxygen. The reduced blood flow is often associated with a partial or complete blockage of the coronary arteries, such as occurs with coronary artery disease. http://www.mayoclinic.org/diseases-conditions/myocardial-ischemia/basics/definition/con-20035096 (last visited September 14, 2016.)

On November 28, 2012, Byrd was admitted to SUNY Downstate and was discharged on

November 30, 2012 after undergoing a diagnostic cardiac catheterization. (*Id.* at 455–56.) Byrd

was primarily diagnosed with chest pain-angina, and additionally with hypertension, COPD

(chronic obstructive pulmonary disease), CAD (coronary artery disease), s/p PCI (percutaneous

coronary intervention), and s/p pacemaker. (*Id.* at 456.) She was advised of the importance of

not smoking. (*Id.* at 457.) She was also advised that she could drive independently and resume

normal activities with help. (*Id.*)

## C. Testimonial and Vocational Evidence

Byrd was 43 years old at the date of her alleged disability onset date of February 24,

2011, and 45 years old on the date of the ALJ's decision. (*See id.* at 198.) Byrd worked as a

cashier from 2000 to 2003, and from 2005 to 2011. (*Id.* at 130.)

On March 31, 2011, Byrd completed an Activity of Daily Living Report. (*Id.* at 236–40.)

Byrd stated that sleeping was difficult, lifting her arm caused pain at the site of her stitches,[2] and

that her daughters assisted her in bathing. (*Id.* at 237.) She also stated that her daughters helped

with cooking and that she did not cook. (*Id.* at 237–38.) Byrd's daughters and her son assisted

her with household chores. (*Id.* at 239.) Byrd was able to travel by herself. (*Id.*)

At the hearing held on January 24, 2013, Byrd testified that she stopped working due to a

heart attack. (*Id.* at 132, 137.) Byrd lived with an adult son, and an adult and teenage daughter.

(*Id.* at 137–38.) According to Byrd, her children cleaned, cooked, and did grocery shopping.

(*Id.* at 138.) Byrd testified that she was unable to lift anything and that she could walk two

blocks before needing to rest. (*Id.* at 138–39.) Byrd spent most of her time at home sleeping.

(*Id.* at 140.) Byrd had trouble sitting and watching television because she could not lean on her

---

[2] Byrd did not specify what the stitches were from, but it appears likely that she is referring to the stitches at the site of her pacemaker.

right arm and because her eyes bothered her.  (*Id.* at 141.)  Byrd testified that mostly, if she was

not sleeping, she was sitting.  (*Id.* at 142.)  Byrd testified that she smoked once in a while, about

two cigarettes per day.  (*Id.* at 134.)

Vocational expert Christina Boardman appeared at the hearing via telephone and

confirmed that Byrd's past employment as a cashier was DOT code 211.462-014, "semiskilled,

SVP: 3, light work."  (*Id.* at 131.)

### D.  Non-Duplicative Medical Evidence Submitted after the ALJ's decision to the Appeals Council

#### a.  Evidence Dated Prior to the ALJ's Decision

##### i.  Woodhull Medical Center – Dr. Mario Sabado & Dr. Abdul Ansari

On March 17, 2011, following the implantation of the pacemaker, Byrd went to Dr.

Mario Sabado for a follow-up at Woodhull.  (*Id.* at 600.)  Byrd denied any shortness of breath or

chest pain at that time, but had occasional discomfort in the chest area and itching at the wound

site.  (*Id.*)  Byrd was advised that she needed a cardiology evaluation.  (*Id.* at 601.)  On March

21, 2011, Byrd was seen by Dr. Abdul Ansari.  (*Id.* at 602–07.)  Byrd was alert and oriented with

a steady gait.  (*Id.* at 604.)  Byrd complained of epigastric pain which Dr. Ansari believed was

likely of cardiac origin.  (*Id.* at 606.)  Byrd denied any chest pain or shortness of breath.  (*Id.* at

603.)  The site of her pacemaker placement was clean and dry with no redness.  (*Id.* at 604.)

During this time, Byrd was classified as a current everyday/someday smoker.  (*Id.* at 605.)  Byrd

declined prescription assistance to quit smoking.  (*Id.*)

On April 4, 2011, Byrd returned to Woodhull for a follow-up visit.  (*Id.* at 614.)  Byrd

reported epigastric pain associated with nausea, occasional vomiting, and constipation.  (*Id.* at

614–15.)  She reported that she felt as if food got "stuck" in her stomach and indicated that pain

started in her chest and went down to the epigastric area. (*Id.*) Byrd was directed to take Metamucil powder and to schedule a colonoscopy. (*Id.* at 615–17.) On April 14, 2011, Byrd reported to Dr. Sabado for a follow-up visit. (*Id.* at 618.) Byrd complained of occasional discomfort at the site of the pacemaker. (*Id.*) There was no hematoma, nor any sign of infection. (*Id.*) On April 18, 2011, Byrd saw Dr. Ansari for a follow-up. (*Id.* at 620.) She complained of intermittent atypical chest pain. (*Id.*) Dr. Ansari found that Byrd's wound was well healed and that she had no heart murmurs. (*Id.* at 621.)

Pulmonary function testing conducted on May 21, 2012, revealed a minimal obstructive lung defect. (*Id.* at 471.)

### ii.  SUNY Downstate – Dr. Jose Cabassa

On November 14, 2012, Byrd saw Dr. Jose Cabassa in the neurology department at SUNY Downstate with a recent history of shoulder pain and discomfort. (*Id.* at 474–76.) Byrd denied any chest pain or palpitations, but reported occasional labored breathing on exertion. (*Id.* at 474.)

Byrd returned for a follow-up visit with Dr. Cabassa on May 7, 2013. (*Id.* at 472.) Byrd's notes indicate that the results of an EMG/NCS were normal and that an April 6, 2013 cervical spine computed tomography (CT) scan showed mild degenerative findings. (*Id.* at 473.) He also noted that a head CT scan, completed on March 13, 2013, showed no acute intracranial findings. (*Id.* at 473.)

### b.  Evidence Dated After the ALJ's Decision

### i.  Dr. Joseph Thomas – Internist

Dr. Joseph Thomas, an internist, completed a Multiple Impairment Questionnaire on August 13, 2013. (*Id.* at 70–77.) Dr. Thomas first saw Byrd one week earlier on August 6,

2013. (*Id.* at 70.) He stated that Byrd was treated on a monthly basis. (*Id.*) Dr. Thomas diagnosed congestive heart failure, pacemaker, low back pain, anxiety, insomnia, and depression. (*Id.*) His prognosis was guarded. (*Id.*) Dr. Thomas stated in an impairment questionnaire dated August 13, 2013, that Byrd was likely to be absent from work more than three times a month. (*Id.* at 71.) He also listed several work restrictions for Byrd. (*Id.*) He indicated that Byrd has psychological limitations, a need to avoid fumes and gases, and no pushing, pulling, kneeling, bending, or stooping. (*Id.*) He stated that Byrd needs a job that permits ready access to a restroom. (*Id.*) He did not provide further explanation for these determinations. (*See id.*) Dr. Thomas estimated that Byrd's symptoms date back to 2010, pre-dating her pacemaker surgery and her gastric symptoms. (*Id.* at 71.) In response to a request to identify the laboratory and diagnostic test results which demonstrate and/or support his diagnosis, Dr. Thomas writes, "see attached." (*Id.* at 76.) No documents appear to be attached to the submission. (*Id.*)

From August 6, 2013 through August 7, 2013, Byrd underwent a sleep study at Night and Day Medical. (*Id.* at 88–91, 92–95.) Her results were within normal limits. (*Id.* at 91.)

In a letter dated October 2, 2013, Dr. Thomas wrote Byrd had severe congestive heart failure, insomnia, chronic back pain, hypertension, hyperlipidemia, COPD, and was underweight from chronic nausea. (*Id.* at 51.) He opined that Byrd was unable to work due to heart failure. (*Id.*)

Dr. Thomas also filled out a Residual Functional Capacity Form, dated November 15, 2013. (*Id.* at 55–58.) Byrd's symptoms are headaches, dizziness, mood swings, and nausea. (*Id.* at 55.) Dr. Thomas stated that Byrd's disability was expected to last more than one year or had already lasted more than one year. (*Id.*) He also stated that Byrd had difficulty bending,

squatting, kneeling, and turning parts of the body and that her disability is not likely to change. (*Id.* at 56–57.)

### ii. Dr. Sundaraya Chandrasekaran

The record includes a biopsychosocial assessment, completed on October 16, 2013, by Dr. Sundaraya Chandrasekaran. (*Id.* at 20–48.) Byrd provided Dr. Chandrasekaran with a letter from her doctor stating that she suffered from congestive heart failure, insomnia, chronic back pain, hypertension, hyperlipidemia, and COPD.[3] (*Id.* at 21–23.) The letter also stated that Byrd was underweight due to nausea and that she was unable to work. (*Id.*) Byrd traveled to the assessment by bus and indicated that she normally traveled to appointments by subway and by bus. (*Id.* at 22.) Byrd's assessment yields no mental health conditions other than her affirmative self-reported answer. (*Id.* at 25.) The assessment indicates that she has difficulty seeing and walking, cannot climb stairs, prepare her own meals, or do any housekeeping. (*Id.* at 28.) The medical history portion of the report indicates that Byrd was 46 years old with hypertension, congestive heart failure, coronary artery disease post stent placement and pacemaker insertion. (*Id.* at 32.) The assessment indicates that Byrd reported recurrent vomiting lasting about a year, as well as weight loss. (*Id.*) Byrd reported that her work ability was affected by shortness of breath, fatigue, palpitations, and recurrent vomiting. (*Id.* at 32-33.) An examination completed in connection with the assessment indicates that Byrd has shortness of breath on exertion, is a chronic smoker, and has been diagnosed with COPD. (*Id.* at 36.) The assessment also indicates that Byrd has a history of coronary artery disease with three myocardial infarctions. (*Id.*) The assessment states that Byrd has limitations lifting, walking, pushing, pulling, reaching, kneeling, and squatting. (*Id.* at 43.)

---

[3] Though the assessment does not specify, it is likely that the letter referred to is the letter provided by Dr. Thomas discussed above.

# LEGAL STANDARD

## I. Review of Denial of Social Security Benefits

The Court does not make an independent determination about whether a claimant is disabled when reviewing the final determination of the Commissioner. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the Court "may set aside the Commissioner's determination that a claimant is not disabled only if the [ALJ's] factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "'[S]ubstantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." (*Id.*) (internal quotation marks omitted). "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld." *Stemmerman v. Colvin*, No. 13-CV-241 (SLT), 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)). "This deferential standard of review does not apply, however, to the ALJ's legal conclusions." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010). Rather, "[w]here an error of law has been made that might have affected the disposition of the case, [an ALJ's] failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).

## II.     Eligibility for Disability Benefits

"To be eligible for disability insurance benefits, an applicant must be 'insured for disability insurance benefits," *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989) (quoting 42 U.S.C. §§ 423(a)(1)(A), (c)(1)), and must satisfy certain earnings requirements.  *Hartfiel v. Apfel*, 192 F. Supp. 2d 41, 42 n.1 (W.D.N.Y. 2001).  "Generally, an applicant must apply for benefits during the period in which she satisfies these earning requirements.  If the applicant does not apply for benefits during this period, she may still obtain benefits if she has been under a continuous period of disability that began when she was eligible to receive benefits."  *Hartfiel*, 192 F. Supp. 2d at 42 n.1.

To qualify for both disability insurance and Supplemental Security Income benefits, an individual must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(2)(A).  This requires a five-step analysis for determining whether a claimant is disabled:

[1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

[2] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

[3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.

[4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

[5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also* 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proof for the first four steps of the analysis, but the burden shifts to the Commissioner for the fifth step. *See Talavera*, 697 F.3d at 151.

## DISCUSSION

### I. The ALJ Properly Found Byrd Was Not Disabled

The ALJ engaged in the required five-step analysis. At the first step, the ALJ found that Byrd did not engage in substantial gainful activity since the time of her alleged onset date of February 24, 2011. (Admin. R. at 105.) At step two, the ALJ found that Byrd was severely impaired by the following ailments: coronary artery disease/status post percutaneous coronary intervention (stent); status post pacemaker placement; congestive heart failure; asthma/COPD; and acid reflux. (*Id.*) At step three, the ALJ found that these impairments did not meet or qualify as the medical equivalent of any of the listed impairments in Appendix 1 of the regulations. (*Id.* at 106.) The ALJ then assessed Byrd's residual functional capacity ("RFC"),[4] which must be based on all relevant medical and other evidence in the record. *See* 20 C.F.R. § 404.1520(e). The ALJ determined that Byrd had the RFC to perform the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). (*Id.*) At the fourth step, the ALJ found that Byrd was unable to perform any past relevant work. (*Id.* at 109.) At the fifth step, the ALJ determined that there existed a significant number of jobs in the national economy that Byrd could perform within the range of "sedentary work." (*Id.*) Accordingly, the ALJ

---

[4] "A claimant's RFC is the most he can still do despite his limitations." *Mariani v. Colvin*, 567 F. App'x 8, 9 (2d Cir. 2014) (internal quotation marks and alterations omitted).

properly found that Byrd was not disabled for purposes of the SSA and was thus ineligible for benefits. (*Id.*) As set forth below, the ALJ's determination was supported by substantial evidence.

## II. The ALJ's RFC Determination is Supported by Substantial Evidence

The ALJ's determination that Byrd had an RFC for a full range of sedentary work, (Admin. R. at 108), is supported by substantial evidence. As discussed above, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian*, 708 F.3d at 417. To determine whether an ALJ's decision was supported by substantial evidence, the Court examines the record as a whole. *Id.*

Here, the ALJ considered consultative examiner Dr. Caiati' clinical findings from his May 2011 examination of Byrd. (*Id.* at 108.) The ALJ accorded great weight to Dr. Caiati's examination findings, which were benign, including a pulmonary function test, which showed only minimal restriction. (*Id.* at 108, 336–27, 329–30.) Based on his unremarkable examination findings, Dr. Caiati opined that Byrd had no restrictions for sitting, standing, walking, reaching, pushing, pulling, lifting, climbing, or bending. (*Id.* at 328.)

However, the ALJ did not simply adopt Dr. Caiati's opinion that Byrd had no limitations. Rather, he viewed the evidence in the light most favorable to Byrd, and found, based on her pacemaker implantation, that she was limited to sedentary work.[5] (*Id.* at 108.) Moreover, the

---

[5] The fact that the ALJ's RFC finding did not track any one medical opinion is not ground for remand. *See Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole" (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971))). The ALJ is responsible for determining a claimant's RFC. *See* 20 C.F.R. §§ 404.1527(e)(2), 404.1546, 416.927(e)(2), 416.946(c). In determining the RFC, the ALJ must make a decision based on all of the relevant evidence, including a claimant's medical record, statements by physicians, and a claimant's description of her limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). Here, substantial evidence in the record supported the ALJ's determination that Byrd's impairments, singly or in combination, did not preclude her from performing a range of sedentary work. (*See* Admin. R. at 106–09.)

ALJ's RFC determination was not based solely on Dr. Caiati's findings. He also considered the extensive medical record before him, which included, *inter alia*, benign stress test results, EKG results, chest x-ray findings, and pacemaker test findings, which showed that Byrd's pacemaker was working properly. (*Id.* at 108–09, 436–39.)

A consultative examiner's opinion can constitute substantial evidence in support of an ALJ's RFC where the examiner's findings are supported by other evidence in the record. *See Pellam v. Astrue*, 508 F. App'x 87, 90–91 (2d Cir. 2013) (summary order) (finding that medical opinions of consultative examining physicians can constitute substantial evidence when supported by other evidence in the medical record); *Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir. 1995) (finding that the opinions of consultative physicians, combined with the results of medical tests and the plaintiffs testimony constituted substantial evidence). Here, Dr. Caiati's determination was supported by other evidence in the record, specifically the results of several medical tests. Thus, the ALJ was entitled to accord great weight to Dr. Caiati's opinion, and substantial evidence, including Dr. Caiati's findings and objective diagnostic testing, supported the ALJ's determination that Byrd could perform sedentary work.

### III.    The ALJ Properly Developed the Record

The ALJ fully and properly developed the record in this case. An ALJ has an affirmative duty to develop the medical record and seek out further information where there are deficiencies or gaps in the record. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). However, where there are no obvious gaps, and the record presents "a complete medical history," the ALJ is under no duty to seek additional information before rejecting a claim. *Id.* at 79, n.5 (citing *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)). While there are no medical source statements from Byrd's physicians, the ALJ nevertheless fulfilled his duty to develop the record by obtaining

Byrd's complete medical history. *See Lowry v. Astrue*, 474 F. App'x 801, 804 (2d Cir. 2012) (summary order) ("Although an ALJ has an affirmative duty to develop the administrative record . . ., where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim" (quotation marks and citations omitted)); *Housser v. Colvin*, No. 13-CV-1133 (JTC), 2015 WL 162985, at *5 (W.D.N.Y. Jan. 7, 2015) ("[I]t is not per se error for an ALJ to make the RFC determination absent a medical source assessment as to what the claimant can still do despite the limitations caused by his or her impairments." (internal quotation marks omitted)); *Weed Covey v. Colvin*, 96 F. Supp. 3d. 14, 29 (W.D.N.Y. 2015) (same); *Hogan v. Colvin*, No. 12-CV-1093 (MAT), 2015 WL 667906, at *6 (W.D.N.Y. Feb. 17, 2015) (finding that the ALJ was not required to request medical source statements from treating physicians where it was "doubtful" that such statements "would have altered the ALJ's assessment of Plaintiff's RFC" and the record was adequate to permit an informed finding by the ALJ).

Here, the ALJ reviewed Byrd's complete medical history, including substantial treatment notes from Byrd's treating sources for the entire period under adjudication. (*See* Admin. R. at 332–52, 356–61, 363, 379–453, 455–62). *See also Pellam*, 508 F. App'x at 90 (finding that the ALJ did not need to supplement the record by acquiring a medical source statement from a treating physician where he had the opinion of a consultative examiner and all of the treatment notes from the treating physicians). Additionally, Byrd underwent a consultative examination by Dr. Caiati at the request of the Commissioner. (*Id.* at 325–30.) The record now also contains treatment notes from SUNY Downstate and Woodhull submitted to the Appeals Council by Byrd's attorneys that relate to the period at issue. (*Id.* at 464–558, 560–63.) None of these notes

support more restrictive limitations than those that the ALJ found.[6] (*Id.*) Accordingly, the ALJ's

RFC determination was based upon a complete medical record and Byrd's motion for remand

based on the ALJ's alleged failure to develop the record is denied.

**IV.    New and Material Evidence**

Evidence submitted to the Appeals Council becomes part of the record for purposes of

judicial review after the Appeals Council denies review of the ALJ's decision. *Perez v. Chater*,

77 F.3d 41, 45 (2d Cir. 1996). The Appeals Council will consider new and material evidence

only where it relates to the period on or before the date of the ALJ's decision. 20 C.F.R.

§§ 404.967, 404.970(b). The Hearings and Appeals Litigation and Law Manual (HALLEX),

explains that evidence relates to the period on or before the ALJ's decision when it is (1) dated

on or before the date of the ALJ's decision; or (2) post-dates the ALJ's decision but is reasonably

related to the time period adjudicated by the ALJ. HALLEX I-3-3-6(B)(3).[7] Evidence is

material, or relevant, when it is directly related to issues adjudicated by the ALJ. *Id.* I-3-3-

6(B)(2). Where the new and material evidence relates to the period on or before the ALJ's

decision, the Appeals Council will evaluate the entire record, including the new and material

evidence submitted, and will grant review of the case, but only if it finds that the ALJ's

conclusion is contrary to the weight of the evidence currently in the record. 20 C.F.R.

§§ 404.967, 404.970(b); HALLEX I-3-3-6(A); *Rutkowski v. Astrue*, 368 F. App'x. 226, 229 (2d

Cir. 2010) (summary order). "The weight of the evidence is defined as the balance or

---

[6] It is also noteworthy that, despite Byrd's assertion that the ALJ failed to fully develop the record because he did not follow-up with Dr. Singh – a physician from SUNY Downstate who submitted a letter indicating that Byrd should refrain from working – none of the new notes submitted to the Appeals Council contained treatment notes from Dr. Singh.

[7] The HALLEX is available online at https://www.ssa.gov/OP_Home/hallex/I-01/I-1-0-1.html. The purpose of the HALLEX is to provide procedural guidance and information to ALJ and hearing offices. *See* HALLEX I-1-0-1. Such internal agency manuals do not carry the force of law and are entitled to deference only to the extent that they have the power to persuade. *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 125 (2d Cir. 2012).

preponderance of evidence; the inclination of the greater amount of credible evidence to support one side of the issue rather than the other." HALLEX I-3-3-6(C). "In other words, the weight of the evidence means 'it is more likely than not' that the totality of evidence, including the additional evidence, would change the ALJ's action, findings, or conclusion." *Id.*

Here, the additional evidence at issue is Dr. Thomas' August 2013 opinion – which he rendered approximately two months after the ALJ's June 14, 2013 decision – and Dr. Thomas' October and November 2013 opinions – which he rendered four and five months after the ALJ's decision. (*See* Admin. R. at 2; 51–64 70–78.) The Appeals Council correctly found that Dr. Thomas' opinions did not provide a basis for changing the ALJ's decision because they were "about a later time" and therefore did "not affect the decision about whether [Byrd was] disabled beginning on or before June 14, 2013." (*See id.* at 2.)

Although a retrospective opinion that post-dates the relevant period is not necessarily irrelevant, *see* HALLEX I-3-3-6(B)(3), if contemporaneous medical evidence does not support the retrospective opinion, then the opinion is not probative. *See Monette v. Astrue*, 269 F. App'x 109, 112–13 (2d Cir. 2008) (finding no error in the ALJ's refusal to accord a physician's retrospective opinion significant weight where the physician began treating the claimant after the relevant time period and there was substantial evidence that the opinion was contradicted by other evidence); *see also Stellacci v. Barnhart*, No. 02-CV-8875 (SAS), 2003 WL 22801554, at *5 (S.D.N.Y. Nov. 24, 2003) (finding it unnecessary to consider retrospective evidence where a plaintiff was under medical care during the relevant time period and "the only question in determining disability was the severity of her impairment, which was adequately documented by contemporaneous medical assessments and lay evidence").

Here, Dr. Thomas did not treat Byrd during the period at issue – February 24, 2011, her alleged disability onset date, through June 14, 2013, the date of the ALJ's decision. He began treating Byrd on August 6, 2013, almost two months after the ALJ's decision. (Admin. R. at 70.) Thus, while Dr. Thomas opined in a report dated August 13, 2013 that Byrd's symptoms and limitations were present since 2010, this opinion is not based on objective contemporaneous findings by the doctor, as he did not treat her during the period at issue. (Admin. R. at 71.) Further, this retrospective opinion addressing the severity of Byrd's symptoms and her functional capacity is inconsistent with the contemporaneous examination findings in the record, which failed to show disabling functional limitations, as discussed above. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). Moreover, that retrospective opinion was rendered by Dr. Thomas only one week after he first treated Byrd. (Admin. R. at 70.) Accordingly, his opinion would not warrant the weight typically afforded to a treating physician's opinion. *See Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order) (noting that a treating physician's opinion is given extra weight because of the physician's unique position resulting from the continuity of treatment and further noting that that extra weight is not warranted where a physician has only examined the claimant once or twice); *see also* 20 C.F.R. §§ 404.1527(c)(2)–(3), 416.927(c)(2)–(3) (stating that one factor in weighing a medical source opinion is the length of treatment relationship and "[t]he more a medical source presents evidence to support an opinion, particularly medical signs and laboratory findings, the more weight [the adjudicator] will give that opinion"). Accordingly, the Appeals Council could reasonably conclude that Dr. Thomas' August 2013 assessment would not provide a basis for changing the ALJ's decision.

Dr. Thomas' October and November 2013 opinions do not constitute new material evidence as they contain no information indicating that they are retrospective opinions relevant to the time period at issue.  Additionally, the October 2013 letter stating that Byrd could not work, (Admin. R. at 51), is wholly conclusory.  *See Rutkowski*, F. App'x at 229–30 (holding that a conclusory, one-page document that does not explain the facts or reasoning leading to the determination was insufficient new evidence "to make the ALJ's decision contrary to the weight of the evidence").  Moreover, under the Social Security Act, a physician's statement as to an individual's disability or inability to work is a statement on an issue reserved to the Commissioner and is not entitled to any special significance.  20 C.F.R. §§ 404.1527(d), 416.927(d); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[S]ome kinds of findings – including the ultimate finding of whether a claimant is disabled and cannot work – are reserved to the Commissioner." (internal quotation marks omitted)).

Based on the foregoing, the Appeals Council reasonably concluded that the ALJ's decision is not contrary to the weight of the evidence currently in the record and properly declined to grant review of the ALJ's decision based on Dr. Thomas' opinions.

## V.  The ALJ Properly Assessed Byrd's Credibility

In determining Byrd's RFC, the ALJ also considered Byrd's subjective complaints of pain and functional limitations and found that Byrd's statements were not fully credible. (Admin. R. at 107.)  The ALJ must analyze the credibility of a claimant as to her symptoms through a two-step test.  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  The ALJ must first decide "whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged."  *Id.* (citing 20 C.F.R. § 404.1529(b)).  Next, if the ALJ determines the claimant does have such an impairment, he

must consider "'the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (quoting 20 C.F.R. § 404.1529(a) (alternations omitted)). Other evidence of record that the ALJ must consider includes:

> (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain.

*Meadors v. Astrue*, 370 F. App'x 179, 184 n.1 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(c)(3)). "While it is 'not sufficient for the ALJ to make a single, conclusory statement that' the claimant is not credible or simply recite the relevant factors, remand is not required where 'the evidence of record permits [the Court] to glean the rationale of the ALJ's [credibility] decision.'" *Cichocki v. Astrue*, 534 Fed. App'x. 71, 76 (2d. Cir. 2013) (summary order) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). In such a case, "the ALJ's failure to discuss those factors not relevant to [his] credibility determination does not require remand." *Id.*

Here, at step one of the inquiry, the ALJ found that Byrd's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Admin. R. at 107.) At step two of the inquiry, however, the ALJ found that Byrd's statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely credible.[8] (*Id.*) In so finding, the ALJ properly considered the objective medical evidence and the factors set forth above. (*See* Admin. R. at 107–09.)

---

[8] The ALJ did however give some weight to Byrd's testimony by finding, contrary to Dr. Caiati's opinion, that Byrd was limited to sedentary work. (Admin. R. at 108.)

For example, the ALJ considered that examination findings and treatment notes from treating and consultative sources failed to support the degree of Byrd's allegations of disabling limitations. (Admin. R. at 107.) Significantly, in May 2011, after Byrd's pacemaker procedure, a physical examination was normal, in spite of Byrd's complaints of gastritis. (*Id.* at 108, *referring to id.* at 446–50.) A May 2011 pulmonary function test (PFT) also showed only minimal restrictions, even with "poor effort" on the part of Byrd. (*Id.* at 108, *referring to id.* at 327–29.) The ALJ further noted that, despite Byrd's complaints of chest pain, objective studies showed mostly normal findings. (*Id.* at 108.) For example, a December 2011 chest x-ray revealed no evidence of pleural/pulmonary pathology. (*Id.* at 108, *referring to id.* at 436.) A January 2012 stress test revealed no ischemic changes, and showed an ejection fraction at 71% and good left ventricle wall motion. (*Id.* at 108, *referring to id.* at 437.) The study also failed to reveal any exercise induced ischemia. (*Id.* at 108, *referring to id.* at 437.) Additionally, in March 2012, Byrd's pacemaker was assessed and it was found to be functioning properly. (*Id.* at 108, *referring to id.* at 437–40.) Thus, the objective medical evidence, including stress test results, x-ray results, and Byrd's well-functioning pacemaker, supported a finding that Byrd's symptoms were well-managed and that she could perform sedentary work. (*See id.* at 108.)

The ALJ also considered Byrd's treatment. In February 2011, just a few days after Byrd's alleged disability onset, Dr. Lee noted that Byrd's hypertension was controlled with medication. (*Id.* at 107, *referring to id.* at 306.) 20 C.F.R. §§ 404.1529(c)(3)(iv–v), 416.929(c)(3)(iv–v) (stating that in evaluating the intensity and persistence of symptoms, the ALJ may consider effectiveness of treatment). The ALJ also considered that Byrd smoked and refused medication to help stop, despite repeated medical advice informing her of the importance

of not smoking.[9]  *See Weed Covey*, 96 F. Supp. 3d at 33 (finding that an individual's statements may be less credible if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure).  (Admin. R. at 107 *referring to id.* at 304; *id.* at 108 *referring to id.* at 356, 447, 457.)

The ALJ has stated sufficient reasons for his credibility determination, which is supported by substantial evidence.  *See Lowry*, 474 F. App'x at 805 (finding an ALJ's credibility determination appropriately supported where his "rationale for his adverse credibility decision [was] evident from his references to the medical record"); *see also Aponte v. Sec'y, Dep't of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) ("If the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." (internal citations omitted)); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").

## CONCLUSION

For the reasons set forth above, Byrd's motion is DENIED, the Commissioner's cross-motion is GRANTED.  The Clerk of Court shall enter Judgment accordingly.

SO ORDERED.

Dated: Brooklyn, New York
       September 28, 2016

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge

---

[9] To consider noncompliance with treatment as a basis for credibility, the ALJ must consider "any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *Weed Covey*, 96 F. Supp. 3d at 33 (internal quotation marks and citation omitted).  However, the ALJ is not required to explicitly reference the specific evidence considered. *Id.*  Here, Byrd did not provide and the record does not evidence a reason for Byrd's refusal of medication to help her stop smoking.